UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,         )
                                )
      v.                         )        1:10-cv-00435-JAW
                                )
GLENN A. BAXTER,                 )
                                )
              Defendant.         )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

The United States seeks summary judgment against Glenn A. Baxter, a Federal Communications Commission (FCC) amateur radio licensee, for forfeitures based on three asserted violations of the Communications Act of 1934 (Act) and its regulations: 1) failure to respond to an FCC inquiry in violation of 47 U.S.C. § 308; 2) willful or malicious interference with other radio transmissions in violation of 47 C.F.R. § 97.101(d); and 3) engaging in communications in which he has a pecuniary interest in violation of 47 C.F.R. § 97.113(a)(3). The Court concludes that summary judgment is appropriate for the Defendant's failure to respond and malicious interference but that summary judgment is not appropriate for the last claimed forfeiture because there are genuine issues of material fact as to whether he engaged in communications in which he had a pecuniary interest.

## I.    STATEMENT OF FACTS

### A.    Procedural Background

On October 25, 2010, the United States of America (the Government) filed a complaint in this Court against Glenn A. Baxter, seeking to reduce to judgment an unpaid FCC forfeiture order for $21,000 under Section 503(b) of the Act, 47 U.S.C. § 503(b).  *Compl.* (Docket # 1).  On November 5, 2010, the Government filed an amended complaint.  *Am. Compl.* (Docket # 4).  The same day, Mr. Baxter, acting *pro se*, filed an answer, *Answer and $50,000,000 Countersuit* (Docket # 5), and on November 18, 2010, an amended answer and counterclaim, *Verified Answer to Am. Compl. and Am. $50,000,000 Countersuit* (*Am. Ans.*) (Docket # 8).  The Government moved to dismiss Mr. Baxter's counterclaim on a variety of grounds and the Court granted the Government's motion.  *Order on Mot. to Dismiss Am. Countercl.* (Docket # 26).

On May 18, 2011, the Government moved for summary judgment, seeking judgment for violations of five separate FCC rules and regulations in the full amount of the FCC's forfeiture order: $21,000.  *Mot. for Summ. J.* (Docket # 23) (*Gov't's Mot.*).  On June 1, 2010, Mr. Baxter filed his response.  *Verified Opp'n to Gov't Mot. for Summ. J.* (Docket # 28) (*Def.'s Opp'n*).  On June 23, 2010, the Government replied.  *Reply Mem. in Support of Mot. for Summ J.* (Docket # 32) (*Gov't's Reply*).  In its reply, the Government amended its motion for summary judgment, seeking judgment in the amount of $14,000 for three alleged violations: 1) failure to respond to an FCC inquiry, a violation of 18 U.S.C. § 308; 2) willful or

malicious interference with other radio transmissions, a violation of 47 C.F.R. § 97.101(d); and 3) communications in which an amateur licensee has a pecuniary interest, a violation of 47 C.F.R. § 97.113(a)(3).  *Id.* at 1, 7.

On June 28, 2011, Mr. Baxter filed a sur-response, *Def.'s Resp. to Pl.'s Reply Mem. in Support of Mot. for Summ. J.* (Docket # 34) (*Def.'s Sur-Resp.*), and an amended response to the Government's motion for summary judgment, *Def.'s Am. Resp. to Mot. for Summ J.* (Docket # 36) (*Def.'s Am. Opp'n*).

With its summary judgment motion, the Government filed a statement of material facts.  *Gov't's Statement of Undisputed Material Facts* (Docket # 24) (PSMF).  Mr. Baxter did not respond to the Government's statement of facts; instead, on June 1, 2011, he filed a separate statement of facts.  *Def.'s Material Facts as to Where a Genuine Issue Needs to be Tried Before a Requested Jury by Trial De Novo* (Docket # 29) (DSMF).  On June 23, 2011, the Government filed a reply to Mr. Baxter's statement of facts.  *Reply Statement of Material Facts* (Docket # 33) (PRDSMF).  On June 28, 2011, Mr. Baxter filed a sur-response to the Government's reply statement of material facts, *Def.'s Resp. to Pl.'s Reply Statement of Material Facts* (Docket # 35) (DRPRDSMF), and a response to the Government's original statement of material facts, *Def.'s Am. Resp. to Pl.'s Statement of Material Facts* (Docket # 37) (DARPSMF).

## B.    Glenn A. Baxter's Failure to Comply with Local Rule 56

Mr. Baxter has delayed the Court's work and made its job substantially more difficult by failing to comply with Local Rule 56.  *See* D. ME. LOC. R. 56; DSMF;

3

DARPSMF; DRPRDSMF.  On May 18, 2011, the Government duly filed with its motion a Statement of Material Facts, consisting of thirty-three asserted statements, supported by appropriate record citations in conformance with Local Rule 56(b).  PSMF.

Upon the filing of the movant's statement of material facts, Local Rule 56(c) requires a party opposing a motion for summary judgment to submit an opposing statement that "shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts, and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule."  D. ME. LOC. R. 56(c).  Instead on June 1, 2011, Mr. Baxter filed a document entitled "Material Facts as to Where a Genuine Issue Needs to be Tried Before a Requested Jury by Trial De Novo."  DSMF.  In this document, Mr. Baxter cites numerical references; however, the Court could not coordinate his numbered references with any of the documents in the case.  He also makes factual assertions, which under Local Rule 56(c) should have been placed in his opposing statement of material facts.  D. ME. LOC. R. 56(c).  On June 23, 2011, the Government replied to Mr. Baxter's filing, noting that he had failed to comply with the Local Rules and asking that in accordance with Local Rule 56(f), the Government's statements be deemed admitted.  PRDSMF at 1-2.

On June 28, 2011, Mr. Baxter filed two documents: 1) "Defendant's Amended Response to Plaintiff's Statement of Material Facts" (DARPSMF), with an attachment entitled "Amended Material Facts as to Where a Genuine Issue Needs

to be Tried Before a Requested Jury by Trial De Novo" (DASMF); and 2) "Defendant's Response to Plaintiff's Reply Statement of Material Facts" (DRPRDSMF). The Amended Response stated:

> Now comes Glenn A. Baxter, P.E., K1MAN, Defendant, and makes this sworn affidavit of his own personal knowledge regarding the Plaintiff's above referenced pleading and claims that there are genuine issues of material facts to be tried by the requested trial de novo. To comply with local Rule 56 with minimum confusion for the Court, Defendant made hand notations on Plaintiff's original pleadings with reference numbers designated by #1, #2, #3, etc., to refer to Defendant's Master Response Key as follows:

> #1 Admit: Defendant admits Plaintiff's pleading but claims that this (these) is (are) a genuine issue (issues) of material fact(s) that need(s) to be tried by a jury.

> #2 Deny: Defendant denies Plaintiff's pleading and claims that this (these) is (are) a genuine issue (issues) of material facts(s) that need(s) to be tried by a jury.

> . . .

> #9 Qualify: Defendant neither admits nor denies Plaintiff's pleading but claims that there are genuine issues of material fact that need to be tried by a jury.

DARPSMF at 1. Mr. Baxter also attached a copy of the Government's Statement of Material Facts with handwritten notations. DARPSMF Attach. 1 (PSMF *with notations*). For example, the notation for paragraphs 1 (in part), 4, 5, and 12 is "# 1," in which Mr. Baxter admits the statements. The notation for paragraphs 1 (in part), 6, 13 (in part), and 14-30 is "# 2," in which he denies the statements. The notation for paragraphs 1 (in part), 2-3, 7-11, 31-33 is "# 9," in which he posits a qualified response. Although unorthodox, the Court accepts Mr. Baxter's Master

Response Key approach and uses it to determine whether he has admitted, denied, or interposed a qualified response to each statement.

The Local Rule requires more.  In general, if an opposing party denies or qualifies his response, the Rule requires that he explain why by reference to the record:

> The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts <u>and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.</u>

D. ME. LOC. R. 56(c) (emphasis supplied).  Presumably in an attempt to comply with this part of the Rule, Mr. Baxter also set forth a total of thirty-six paragraphs with assertions, beginning with number 4 and continuing through number 36 (without number 9).  DARPSMF at 2-6.  For example, number 4 reads:

> Mere reference to a licensee's web site in a non commercial and non pecuniary context does not violate FCC Rule 97.113(a)(3) which bans transmissions over amateur radio with a pecuniary interest for the licensee.  This is a genuine issue of material fact as to whether the licensee had any pecuniary intent or received as much as one dime if (sic) income on a case by case basis with regard to the web site reference and should be decided only by a jury.

DARPSMF at 2.  It is extremely difficult to place each of these paragraphs in context, especially because each contains an assertion but none cites the record in support.

Regarding his Amended Material Facts as to Where a Genuine Issue Needs to be Tried Before a Requested Jury by Trial De Novo, Mr. Baxter begins with a series of statements in an effort to refute the Government's case.  DASMF at 1-3.

He then presents sixteen numbered items, containing various factual and legal assertions. *Id.* at 3-12.

Mr. Baxter's idiosyncratic responses to the court-sanctioned summary judgment process have placed the Court in an awkward position. Court rules must be followed by all litigants in order to maintain a level playing field. Thus, "*pro se* litigants are not excused from complying with the Federal Rules of Civil Procedure or the Local Rules of this district." *Philbrick v. Me. Dep't of Health and Human Servs.*, 616 F. Supp. 2d 123, 126 n.3 (D. Me. 2009); *FDIC v. Anchor Props.*, 13 F.3d 27, 31 (1st Cir. 1994). Furthermore, even though Mr. Baxter is *pro se*, it is obvious that he is aware of the Local Rules because he cited them. *See Marcello v. Maine*, 489 F. Supp. 2d 70, 76-79 (D. Me. 2007). He just has not complied with them.

Moreover, the Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a *pro se* party in the summary judgment context, it is also true that "[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases." *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007). Unfortunately, Mr. Baxter's handling of the case has forced the Court to devote excessive time to this motion, and in attempting to be fair to the *pro se* party who has not fully complied with the Rules, the Court cannot be unfair to the represented party who has.

Here, the Court's job is even more difficult because Mr. Baxter is clearly bristling with irritation with the Government.  In his filings, he has accused United States Attorney Thomas Delahanty of being "devious" and "unethical" and has demanded his "impeachment."  *Am. Ans.* at 2-3.  In his responses to the pending motion, among other things, he has outright accused some people of lying, he has submitted an affidavit from a Mr. George Arsics that accuses the FCC of being a "cesspool of corruption where only money and egos mattered," and he has charged FCC Special Counsel W. Riley Hollingsworth with violating federal criminal law. *Def.'s Am. Opp'n* at 4-7.  The Court has sought to separate out Mr. Baxter's factual and policy disputes with the Government, a distinction clearer in theory than in fact.

In evaluating this motion, the Court has done its best to apply the law evenly, to isolate facts in dispute, to determine whether the disputes are genuine, and to assess whether the genuinely disputed matters are material.  At the same time, the Court cannot allow Mr. Baxter to avoid summary judgment by attempting to manufacture a factual dispute.  Here, the Government posited some of the contents of the exchanges between the Agency and Mr. Baxter, and Mr. Baxter either denied or refused to admit or deny many of those paragraphs:

1)   First FCC Warning Notice dated September 15, 2004, PSMF ¶¶ 2, 3;  Mr. Baxter neither admitted nor denied, DSMF at 3;

2)   First Baxter Response dated October 14, 2004, PSMF ¶¶ 4-6; Mr. Baxter admitted, DSMF at 4;

3)   Second FCC Warning Notice dated October 29, 2004, PSMF ¶¶ 7-10; Mr. Baxter neither admitted nor denied, DSMF at 5-6;

4)   Second Baxter Response dated November 2, 2004, PSMF ¶¶ 11-12; Mr. Baxter neither admitted nor denied the FCC's assertion that he responded in writing to the Second Warning Notice, but admitted some of the contents of the letter, DSMF at 6;

5)   FCC Monitoring from November 25, 2004 through March 31, 2005, PSMF ¶¶ 13-18; Mr. Baxter denied each of the Government's statements regarding its monitoring of his transmissions, DARPSMF at 1-4, 6;

6)   Notice of Apparent Liability dated June 7, 2005, PSMF ¶¶ 19-27; Mr. Baxter denied each of the FCC's assertions regarding its Notice of Apparent Liability, DARPSMF at 4;

7)   Forfeiture Order dated March 29, 2006, PSMF ¶¶ 28-30; Mr. Baxter denied each of the FCC's assertions concerning its Forfeiture Notice, DARPSMF at 4; and

8)   Demand for Payment dated June 20, 2006, PSMF ¶¶ 31-33; Mr. Baxter neither admitted nor denied the FCC's assertions that it demanded that Mr. Baxter pay the forfeiture amount, DARPSMF at 1.

The Court will not accept Mr. Baxter's flat-out denials or failures to admit documents that are properly part of the summary judgment record. First, the Government complied with the Local Rule in placing these documents before the Court by affidavit. PSMF Attach. 1 (*Roth Decl.*) at 1-2. Second, Mr. Baxter's responses are occasionally contradictory. Although he refused to admit or deny the existence and authenticity of the FCC's first Warning Notice, he admitted that he responded to it, and although he refused to admit or deny the existence and authenticity of the FCC's second Warning Notice, he admitted a portion of his response. Third, if Mr. Baxter has a good faith basis for refusing to admit the existence and authenticity of records, he failed to comply with Local Rule 56(c) and explain what that basis is. Typically, the sanction for failure to comply with the

Rules is that the statements are deemed admitted and any objections are waived. D. ME. LOC. R. 56(f). Finally, many of Mr. Baxter's own arguments assume the existence and authenticity of the documents he refused to admit. In sum, the Court has every reason to conclude that the documents to which the Government made reference in its statement of material facts are what the Government claims they are. FED. R. EVID. 901(a), (b)(7). The Court will not allow Mr. Baxter to obtain a trial by denying the existence of documents he knows truly exist and that he should have admitted.

Carefully reviewing Mr. Baxter's responses, it may be that he is skittish about admitting the authenticity and existence of these documents because he is afraid that by doing so, he will be held to have admitted the truth of their contents. This is not an uncommon mistake. *See Knowlton v. Shaw*, 791 F. Supp. 2d 220, 266 (D. Me. 2011) ("The difference between the accuracy and truth of a statement sometimes eludes witnesses."). In considering the documents that the Government has properly placed before the Court, the Court has not accepted the truth of their contents.

The verbatim accuracy of the transcripts of the transmissions is another matter. Here, the Court shares Mr. Baxter's concerns about the absolute accuracy of the transcripts that the Government has produced. For example, regarding its last forfeiture demand (for allegedly referring listeners to a website in which he had a pecuniary interest), the Government's statements of material fact referred to transcripts of his November 25, 2004 and March 30, 2005 transmissions. PSMF ¶¶

13, 17.  To substantiate the accuracy of the transcripts of these transmissions, the Government cited the sworn Declaration of Sharon L. Webber, Regional Counsel of the Northeast Region of the FCC EB.[1]  PSMF Ex. 2 (*Webber Decl.*).  In her declaration, Attorney Webber states that she listened to the tapes of the November 25, 2004 and March 30, 2005 transmissions (among others), and that "[t]o the best of [her] knowledge and belief, the transcripts accurately set forth the contents of the tape recordings."  *Id.* ¶ 10.

In view of Mr. Baxter's denial that the transcripts were accurate, the Court carefully reviewed the transcripts attached to Attorney Webber's affidavit.  *Webber Decl.* Exs. 2a, 2b, 2c, 2g.  The transcripts of the November 25, 2004 transmissions are confusing at best.  Attorney Webber mentions three tapes of the November 25, 2004 transmission and says that Exhibit 2a (Bates pages BAXTER-00288 to 395) began at 9:21 a.m. EST, Exhibit 2b (Bates pages BAXTER-00396 to 504) began at 2:32 p.m. EST, and Exhibit 2c (Bates pages BAXTER-00556 to 651) began at 10:58 a.m. EST.  *Webber Decl.* ¶ 4.  The front page of the transcript in Exhibit 2a says it contains the contents of Tapes 1a and 1b; the front page of the transcript in Exhibit 2b says it contains the contents of Tapes 3a and 3b, and the front page of the transcript in Exhibit 2c says it contains the contents of Tapes 2a and 2b.  *Webber Decl.* Exs. 2a, 2b, 2c.  Yet, Tapes 1a and 1b are virtually identical to Tapes 2a and 2b.

---

[1] The Government also referred to its requests for admissions, but they would not be sufficient to support the paragraphs because Mr. Baxter filed a response denying the requests.  PSMF Attach. 3-4.

Moreover, it appears that the same recorded dialogue is reported slightly differently in the transcripts.  Interestingly, at the beginning of both transcripts, a caller uses memorable phrases in talking to Mr. Baxter.  The transcript of Exhibit 2a reads:

> I am astonished at the amount of hubris you display when you say you're going to remain in the amateur radio mix for the foreseeable future.  That's very <u>discouraging</u> news to some of us.  I believe that you are inebriated with the exuberance of your own verbosity, and the <u>oblique</u>, the (inaudible) versions and the deprecatory remarks that you put on the air about various people who are exceeded only by your buddy Richard Whitten (phonetic) when he was an amateur.

*Webber Decl.* Ex. 2a at 3:17-4:7.  The transcript of Exhibit 2b reads:

> - <u>distressing</u> news to some of us.  I believe that you are inebriated with the exuberance of your own verbosity, and the <u>ubiquity</u>, and (inaudible) versions and the deprecatory remarks that you put on the air about various people, are exceeded only by your buddy Richard Whitten when he was an amateur.

*Webber Decl.* Ex. 2b at 2:3-10.

The Court is confused.  First, if Tape 1a began at 9:21 a.m. and Tape 2a began at 10:58 a.m., why do both tapes contain the same dialogue?  It is possible that the transmissions amounted to a rebroadcast of the same information, but the Government nowhere says that this was the case.  Second, why does attachment 13 begin in the middle of a sentence?  Again, Mr. Baxter may have started the rebroadcast (if he made one) in the middle, but the Government has not said so.  Most important, why are there differences in the quoted language in these transcripts?  Both versions cannot be accurate.

Because some of the transcripts present accuracy questions, the Court has not accepted them at face value. Instead, the Court has reviewed each legal issue to determine whether verbatim accuracy is essential to the disposition of the motion.

### C.    Undisputed Material Facts[2]

Mr. Baxter holds an amateur radio license from the FCC to operate amateur radio station K1MAN. PSMF ¶ 1; DARPSMF at 1 (# 1). Mr. Baxter publishes a schedule of the one-way information bulletins he transmits from his amateur station K1MAN on the American Amateur Radio Association (AARA) website located at www.k1man.com, which he maintains, and frequently refers listeners to his website during his radio transmissions. PSMF ¶¶ 13, 17; DSMF at 6-8, 10-11; *Def.'s Opp'n* at 10.

On November 3, 1989, in response to a complaint of station interference due to K1MAN's transmission of recorded one-way broadcasts, the FCC sent a letter to Mr. Kenneth Black, the third party complainant. DSMF Attach. 2 (*1989 FCC to Black Letter*); *Gov't's Reply* Ex. 1 *Cross Decl.* ¶ 4 (*Cross Decl.*). The letter informed Mr. Black that the FCC was familiar with the types of broadcasts Mr. Black described and found them similar to the information bulletins broadcast by W1AW, an amateur station licensed to the American Radio Relay League's Headquarters Operators' Club. *1989 FCC to Black Letter*. The FCC letter also informed Mr.

---

[2] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Baxter's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). Because of the number of filings and the complications caused by Mr. Baxter's failure to comply with the local rules, the Court lists here only those facts which pertain to the three counts on which the Government now seeks summary judgment.

Black that amateur radio operators are permitted to transmit amateur service information bulletins pursuant to 47 C.F.R. § 97.111(b)(6).  *Id.*

On January 29, 2002, the FCC sent a letter to Mr. Baxter stating that they had received numerous complaints against K1MAN of deliberate interference. *Cross Decl.*, Ex. A (*January 2002 FCC Letter*) at 3.  The letter stated that it appeared from previous correspondence that Mr. Baxter had several misunderstandings about the rules and regulations governing the use of amateur radio frequencies, and explained that any of his transmissions that start on top of ongoing communications constitute deliberate interference in direct violation of the Commission's rules, despite the existence of any "published" bulletin schedule on the K1MAN website.  *Id.* at 2.  The letter also explained that the reference in the regulations to a published schedule 30 days in advance of information bulletin transmissions pertains to compensation for control operators of club stations and that that section does not apply to Mr. Baxter and K1MAN, which is not a club station.  *Id.* at 2-3.

On April 14, 2004, the FCC sent Mr. Baxter another letter explaining both the ways in which Mr. Baxter's amateur station had come into compliance after the January 2002 letter and two remaining ways in which K1MAN was still violating FCC rules, namely deliberate interference resulting from beginning transmissions on top of ongoing communications and the use of his amateur radio station to transmit communications in which he had a pecuniary interest.  *Cross Decl.* Ex. B (*April 2004 FCC Letter*) at 2; DSMF at 5.  The letter warned Mr. Baxter that failure

to come into compliance would lead to enforcement actions against his license and/or the designation of his license renewal application for hearing. *April 2004 FCC Letter* at 2-3.

On September 15, 2004, the FCC's Enforcement Bureau (EB) issued a warning notice to Mr. Baxter requesting information regarding his method of station control and what actions, if any, he was taking in response to several complaints of broadcasting interference.  PSMF ¶ 2; *Cross Decl.* Ex. C (*First Warning Notice*); DSMF at 3.  Mr. Baxter responded by letter dated October 14, 2004, which read:

> Thank you for your letter and your interest in K1MAN.  The legal opinions in your letter referenced above are not correct, and the various allegations are false.  K1MAN is in full compliance with all FCC rules, state laws, and federal laws.  I encourage you to take "enforcement actions" and look forward to seeing you in court(s).
>
> Regarding your request, I hereby certify that:
>
> 1.    No corrective actions are necessary at K1MAN.
>
> 2.    No changes are needed with regard to station control which is in full compliance with all FCC rules.

PSMF Ex. 1e (*First Baxter Response*); DSMF at 4.  Mr. Baxter himself characterizes his response as a "blanket statement" that his station control was in compliance with FCC rules, and admits that it did not contain any more detailed information about the methods of station control he used at K1MAN nor the actions he planned in response to the complaints of station interference that the FCC had received. DSMF at 4; PSMF ¶¶ 4-6.

On October 29, 2004, the FCC issued a second warning notice to Mr. Baxter, notifying him that his first response was insufficient and offering him an additional 20 days to respond to their request for information.  PSMF Ex. 1f (*Second Warning Notice)*; DSMF at 5-6.  Mr. Baxter responded to this second warning notice with a letter dated November 2, 2004, which stated that his first response letter "provided all the information required by FCC rules and by federal law."  PSMF ¶ 12; PSMF Ex. 1(g) (*Second Baxter Response*); DSMF at 6.

On June 7, 2005, the FCC issued a Notice of Apparent Liability to Mr. Baxter, asserting that he was liable for a monetary forfeiture in the amount of $21,000 for the willful and/or repeated violation of several FCC rules and regulations, including 1) willful and repeated interference with ongoing communications of other stations, in violation of 47 C.F.R. § 97.101(d); 2) willful and repeated transmission of communications in which Mr. Baxter had a pecuniary interest, in violation of 47 C.F.R. § 97.113(a)(3); 3) willful and repeated failure to file requested information pursuant to an EB request, in violation of 47 U.S.C. §§ 308(b); 503(b)(1)(B); 4) willful engagement in broadcasting, in violation of 47 C.F.R. § 97.113(b); and 5) willful failure to exercise control of his amateur station, in violation of 47 C.F.R. § 105(a).[3]  PSMF ¶¶ 19-26; *Am. Compl.* Ex. A (*Notice of Apparent Liability*).

---

[3] The Government failed to place either the FCC's Notice of Apparent Liability or the Forfeiture Order before the Court as an attachment to its motion for summary judgment.  These documents are, instead, attached to the amended complaint.  *Am. Compl.* Exs. A, B (Docket # 4).  Better practice is not to rely on an attachment to a complaint, but rather to place the documents before the Court in accordance with the Local Rules.  However, both documents appear to be what they purport to be.  In reviewing Mr. Baxter's arguments, although convoluted, nowhere does he challenge the existence or authenticity of the Notice of Apparent Liability or Forfeiture Order and the Court considers them to

The FCC issued a formal Forfeiture Order against Mr. Baxter on March 29, 2006 in the amount of $21,000.  *Am. Compl.* Ex. B (*Forfeiture Order*); PSMF ¶ 1; DARPSMF at 1 (# 1).  The Order outlines the FCC's basis for imposing a monetary forfeiture for the following violations:  willful and repeated violation of 47 C.F.R. § 97.101(d), willful and repeated violation of 47 C.F.R. § 97.113(a)(3), willful violation of 47 C.F.R. § 97.105(a), willful violation of 47 C.F.R. § 97.113(b), and willful and repeated failure to file required information pursuant to an EB directive.  *Forfeiture Order* at 1.

In support of its motion for summary judgment on the monetary forfeiture, the Government presented FCC transcripts of recordings made on November 27, 2004, December 8, 2004, and March 31, 2005 that it alleges show K1MAN beginning to transmit on top of existing communications by other users.  PSMF Ex. 2d (Nov. 27, 2004); PSMF Ex. 2f (Dec. 8, 2004); PSMF Ex. 2g (Mar. 31, 2005).  The Government also provided the declarations of several FCC personnel who monitored and observed interference between K1MAN and other amateur operators.  *Webber Decl.*; PSMF Ex. 3 (*King Decl.*); PSMF Ex. 4 (*Larrabee Decl.*); PRDSMF Ex. 3 (*Am. Larrabee Decl.*); PRDSMF Ex. 2 (*Am. Webber Decl.*).

Mr. Baxter admitted transmitting on the dates and times alleged by the Government but objected to the Government's "characterization" that he was causing interference to other operators.  DARPSMF Attach. 2 (DASMF) at 10-11.  Mr. Baxter also denied that the transcripts are true, correct, accurate, and

---

be accurate representations of the notices sent to Mr. Baxter by the FCC leading to the current action.

authentic representations of the FCC's monitoring recordings because he does not keep a log of radio transmissions from K1MAN.  DSMF at 6.

The Government also has provided transcripts of recordings made on November 25, 2004 and March 30, 2005 in which Mr. Baxter makes numerous references to his website, www.K1MAN.com.  PSMF ¶¶ 13, 17; PSMF Ex. 2c (Nov. 25, 2004); PSMF Ex. 2g (March 30, 2005).  In his response to the amended Webber Declaration, Mr. Baxter neither admitted nor denied the existence of these transcripts, but he denied Attorney Webber's statement that she compared the recordings with the transcripts and believed them to be accurate.  DARPSMF Attach. 9 (*Def.'s Resp. to Am. Webber Decl.*) at 1 (## 2, 9); DARPSMF Attach. 10 (*Am. Webber Decl. with notations*) at 2-3.  In his response to the amended Larrabee Declaration, Mr. Baxter denied that he ever referred to subscriptions to his newsletter.  DARPSMF Attach. 13 (*Def.'s Resp. to Am. Larrabee Decl.*) at 4 (# 24); DARPSMF Attach. 14 (*Am. Larrabee Decl. with notations*) at 2.  In his opposition to the Government's motion for summary judgment, Mr. Baxter stipulated that he frequently references his website during amateur radio transmissions but insisted it is for non-pecuniary purposes.  *Def.'s Opp'n.* at 10; DSMF at 7-8, 10-11; DASMF at 7-9, 11.

## II.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is material where "its existence or

nonexistence has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London.*, 637 F.3d 53, 56 (1st Cir. 2011) (citing *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). An issue is genuine where "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas*, 637 F.3d at 56 (quoting *McCarthy*, 56 F.3d at 315).  In deciding a motion for summary judgment, the Court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), while "ignoring conclusory allegations, improbable inferences, and unsupported speculation," *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 30 (1st Cir. 2010) (quoting *Sutliffe v. Epping Sch. Dist.,* 584 F.3d 314, 325 (1st Cir. 2009)).

The initial burden is on the moving party to show that there exists an absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets this initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial in order to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In other words, for a party seeking to defeat the motion, "there is a burden of production: the party opposing the motion 'must set forth specific facts showing that there is a genuine issue for trial.'" *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting FED. R. CIV. P. 56(e)).  Furthermore, "the evidence illustrating the factual controversy cannot be conjectural or problematic; it must

have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Id.* (citing *Mack v. Great Atlantic and Pacific Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989); *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1106 (1st Cir.1989)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (internal citation omitted). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz*, 896 F.2d at 8; *see also Vives v. Fajardo,* 472 F.3d 19, 21 (1st Cir. 2007).

## III.   DISCUSSION

### A.   District Court Review

The FCC is the agency congressionally charged with maintaining control over all channels of radio transmission with "the authority to promulgate regulations 'governing the interference potential of devices which in their operation are capable of emitting radio frequency energy . . . in sufficient degree to cause harmful interference to radio communications.'" *Rocky Mountain Radar, Inc. v. FCC*, 158 F.3d 1118, 1123 (10th Cir. 1998) (quoting 47 U.S.C. § 302a(a)). The FCC is statutorily authorized to assess a forfeiture against "[a]ny person who is determined by the Commission . . . to have . . . willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission" or who "willfully or

20

repeatedly failed to comply with any of the provisions of this chapter or any rule, regulation, or order issued by the Commission under this chapter . . . ."  47 U.S.C. § 503(b)(1).  In determining the forfeiture amount, the Act sets forth several factors that must be considered, including the "nature, circumstances, extent, and gravity of the violation" and the violator's "degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."  47 U.S.C. § 503(b)(2)(E).

Pursuant to the Act, the Government may bring suit in the district court of the district where "the person . . . has [his] principal operating office or in any district through which the line or system of the carrier runs" to recover FCC-ordered forfeitures.  47 U.S.C. § 504(a).  Thus, "[t]he district courts . . . have a 'sliver of the jurisdictional pie' for enforcement of FCC orders imposing a monetary forfeiture penalty."  *Rocky Mountain Radar*, 158 F.3d at 1121 (citation omitted).  Here, as Mr. Baxter made transmissions in the District of Maine, this Court has jurisdiction over the Government's lawsuit.  *United States v. Richard*, No. 97-3172 Section "K", 1998 U.S. Dist. LEXIS 18775, at *13 (E.D. La. Nov. 30, 1998).

The Act authorizes a trial de novo before the district court, and the district courts have exclusive original jurisdiction to hear these enforcement suits.  *See* 47 U.S.C. § 504(a) ("any suit for recovery of a forfeiture imposed pursuant to this chapter may be a trial de novo"); *see also Pleasant Broadcasting Co. v. FCC*, 564 F.2d 496, 498 (D.C. Cir. 1977); *Dougan v. FCC*, 21 F.3d 1488, 1490-91 (9th Cir.

1994). The Government must prove the alleged violations by a preponderance of the evidence. *See, e.g., Richard*, 1998 LEXIS 18775, at *18.

Mr. Baxter correctly points out that the Act authorizes a "trial de novo." *Def.'s Opp'n* at 1. However, as with other civil matters, a party's right to a trial depends upon there being a triable issue and if the proponent of summary judgment—in this case the Government—demonstrates that it is entitled to summary judgment, Mr. Baxter would not be entitled to a trial. *See, e.g.*, *Radar Solutions, Ltd. v. FCC*, 368 Fed. Appx. 480 (5th Cir. 2010) (affirming district court's grant of summary judgment); *Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995) (affirming district court's grant of summary judgment); *United States v. Northeast Comm'ns of Wis., Inc.*, 608 F. Supp. 2d 1049 (E.D. Wis. 2008) (granting Government's motion for summary judgment and denying defendant's motion for summary judgment); *United States v. Peninsula Comm'ns, Inc.*, 335 F. Supp. 2d 1013 (D. Alaska 2004) (granting in part and denying in part Government's motion and denying defendant's motion for summary judgment); *see also Miller v. FDIC*, 956 F.2d 58, 60 (4th Cir. 1992) ("[d]espite the trial de novo provision" of the Food Stamp Act, "summary judgment is a proper means of disposing of requests for review" when no genuine issues of material fact exist); *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009) ("the statutory requirement of a trial *de novo*" in the Food and Nutrition Act "is compatible with a summary judgment disposition if there are no material facts in dispute"). As the District of Alaska stated, "[t]he trial *de novo* standard means that the court's review of an FCC forfeiture order is not

limited to the administrative record. It does not mean that summary judgment cannot properly be granted if there are no genuine issues of material facts." *Peninsula Comm'ns*, 335 F. Supp. 2d at 1017.

### B.     The Alleged Violations

In its reply, the Government amended its motion to seek only partial summary judgment in the amount of $14,000 for three specific violations of FCC regulations: 1) failure to respond to an FCC inquiry in violation of 47 U.S.C. § 308; 2) willful or malicious interference with other radio transmissions in violation of 47 C.F.R. § 97.101(d); and 3) communications in which an amateur licensee has a pecuniary interest in violation of 47 C.F.R. § 97.113(a)(3).  *Gov't's Reply* at 1, 7.

### 1.     Violation of 47 U.S.C. § 308 – Failure to Respond to an FCC Inquiry

#### a.     The Legal Background

The holder of an FCC station license is subject to numerous ongoing requirements under the Act, including the obligation to provide further written statements to the FCC on request.  *See* 47 U.S.C. § 308(b) ("The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked").  Under 47 U.S.C. § 503(b)(1)(B), the Act authorizes the FCC to impose monetary forfeiture penalties for willful or repeated failure to comply with the provisions of the Act or of any FCC-issued rule, regulation, or order.  The base forfeiture amount for failure to respond to an FCC inquiry is

23

$3,000.  *See* 47 C.F.R. § 1.80 (Section I. Base Amounts for Section 503 Forfeitures); *In the Matter of the Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, 12 F.C.C. Rcd. 17087, 17113 (1997) (*Forfeiture Policy Statement*).  Under the Act, the FCC must assess several factors in determining the amount of the forfeiture penalties, including the nature, circumstances, extent, and gravity of the violation, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.  47 U.S.C. § 503(b)(2)(E); *see also* 47 C.F.R. § 1.80(b)(5).

As defined by the Act, "willful" means "the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission . . . ."  47 U.S.C. § 312(f)(1); *see also In re Application of Star Wireless, LLC*, 19 F.C.C. Rcd. 18626, 18632 (2004) (noting that section 312(f) definition of willful also applies to forfeitures).  "Repeated," under the Act, is defined as "the commission or omission of [an] act more than once, or, if such commission or omission is continuous, for more than one day."  47 U.S.C. § 312(f)(2).

### b.      The Record Evidence and Glenn Baxter's Defenses

Although Mr. Baxter contends that the FCC's request for information "was lawfully answered . . . with the blanket statement that all station control was in compliance with all FCC rules" in his first response letter dated October 14, 2004, DSMF at 6, the Court readily concludes that he is wrong.  The FCC is entitled to more than a licensee's conclusory assurance that he is in full compliance with all

applicable laws and regulations and a "see you in court" warning.  Despite the FCC's explicit and repeated requests for information, Mr. Baxter's simply stiff-armed the FCC.  The EB's September 15, 2004 warning, Mr. Baxter's October 14, 2004 response, the EB's October 29, 2004 second warning, Mr. Baxter's November 2, 2004 response, and the EB's June 7, 2005 Notice of Apparent Liability clearly reflect the FCC's repeated demands for information and Mr. Baxter's repeated failure to properly respond.

Mr. Baxter's attempted justifications for stonewalling the FCC fall short of creating a genuine issue of material fact.  In his first response to the Government's statement of facts, Mr. Baxter claimed that it was "impossible" to answer the FCC's inquiry more specifically because of the "numerous ways of controlling an amateur station."  DSMF at 4.  However, Mr. Baxter did not tell the FCC that he could not adequately respond for this reason.  Instead, he merely blankly asserted that he was in compliance and he "look[ed] forward to seeing [the FCC] in court(s)." *First Baxter Response*.  Moreover, if there were, as he claims, numerous methods of station control, he was required to clarify for the FCC which methods he was using to operate K1MAN.  The record makes clear that he made no attempt to provide the FCC with any detail; he simply asserted that K1MAN was "in full compliance with all FCC rules, state laws, and federal laws" and dared the FCC to take legal action. *First Baxter Response*.

Mr. Baxter also claims that he was unable to provide detail to the FCC because he is not required to maintain a log and, accordingly, "could not possibly be

expected to remember such detail with any accuracy which would be legally mandatory for any requested information supplied by K1MAN to the FCC." DSMF at 6; *Def.'s Opp'n* at 17. Again, however, in his responses, Mr. Baxter did not attempt to explain this excuse to the FCC. Furthermore, Mr. Baxter's defense is a non-sequitur. With or without a log, Mr. Baxter is the amateur license holder for K1MAN and must have personal knowledge of his own methods of station control. Regardless of whether the FCC rules mandate a log, Mr. Baxter is still required to respond to FCC requests for information, and yet Mr. Baxter cites no authority for the proposition that because he is not required to maintain a log he is also not required to respond to FCC information requests.

Finally, Mr. Baxter erroneously contends that the burden is entirely on the FCC to "attempt to determine who the control operator was" when there are suspected station control violations. DSMF at 6. His argument, however, ignores the obligations of license holders under the Act. All license holders must, pursuant to 47 U.S.C. § 308(b), provide "further written statements of fact to enable [the FCC] to determine whether such license [should be] revoked." 47 U.S.C. § 308(b). Willful or repeated failure to comply with these obligations subjects a license holder to forfeiture penalties. 47 U.S.C. § 503(b)(1)(B).

Here, the FCC asked Mr. Baxter for "written statements of fact" in response to complaints about the operations of K1MAN. When he failed to respond in any meaningful fashion to its request and stonewalled the FCC, the FCC repeated its request and granted him additional time within which to respond. But Mr. Baxter

again stonewalled the FCC.   The Court concludes that the undisputed facts surrounding the FCC's requests for information and Mr. Baxter's willful and repeated failure to provide such facts entitles the Government to a monetary forfeiture pursuant to 47 U.S.C. § 308(b) and 503(b)(1)(B).

### c.      The Forfeiture Amount

The only remaining question is the amount of the forfeiture.   The FCC assessed a forfeiture in the amount of $3,000 pursuant to 47 U.S.C. § 503(b)(1)(B) and 47 C.F.R. § 1.80(a).  In imposing its $3,000 base penalty to Mr. Baxter, the FCC considered the statutorily required factors, including "the nature, circumstances, extent, and gravity of the violation, and with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E); 47 C.F.R. § 1.80(b)(5); *see also Forfeiture Order* at 3.   Accordingly, the forfeiture amount is "within the agency's guidelines and reasonable on its face."  *United States v. Neely*, 595 F. Supp. 2d 662, 667 (D.S.C. 2009).   Furthermore, although he has vociferously contested his liability for the violations, Mr. Baxter has never claimed that the amount of the forfeiture is unreasonable or that he is unable to pay it.   *See id.*   The Court concludes that a $3,000 monetary forfeiture penalty is reasonable for Mr. Baxter's willful and repeated violation of 47 U.S.C. § 308(b).

### 2.      Violation of 47 C.F.R. § 97.101(d) – Willful or Malicious Interference

### a.      The Legal Background

27

Federal regulations promulgated under the Act prohibit amateur radio operators from "willfully or maliciously interfer[ing] with or caus[ing] interference to any radio communications or signal." 47 C.F.R. § 97.101(d); *see also* 47 U.S.C. § 333. The forfeiture amount for intentional interference with another transmission is $7,000. *See* 47 C.F.R. § 1.80; *Forfeiture Policy Statement*, 12 F.C.C. Rcd. at 17113. Federal regulations further require amateur radio licensees to cooperate in selecting transmitting frequencies. *See* 47 C.F.R. § 97.101(b). No frequency is assigned for the exclusive use of any station. *Id.*

"Willful," as defined by the Act, means "the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission . . . ." 47 U.S.C. § 312(f)(1); *see also In re Application of Star Wireless, LLC*, 19 F.C.C. Rcd. at 18632. The FCC has imposed monetary forfeitures against licensees when their actions were "indisputably willful and patently inconsistent with the plain language" of the applicable regulations, even if they "may not have set out with the specific intention of violating" an FCC rule. *In re Application of Star Wireless, LLC*, 19 F.C.C. Rcd. at 18632 (citing *Application for Review of So. Cal. Broad. Co.*, 6 F.C.C. Rcd. 4387, 4388 (1991)).

> **b.     The Record Evidence and Glenn Baxter's Defenses**

According to the Government, the FCC monitored K1MAN's transmissions and heard Mr. Baxter's amateur station K1MAN starting on top of existing communications on at least three occasions: November 27, 2004 at 5:54 p.m. EST,

December 8, 2004 at 7:10 p.m. EST, and March 31, 2005 at 7:28 p.m. EST.  PSMF ¶¶ 14, 16, 18; PSMF Ex. 1b (*Pl.'s Reqs. For Admis.*) ¶¶ 2, 4, 5, 18, 20, 22. Furthermore, the Government produced transcripts of the transmissions that it contends demonstrate Mr. Baxter's violations.  *Webber Decl.* Exs. 2d, 2f, 2g.  During discovery, Mr. Baxter declined to admit that the FCC transcripts were true, correct, accurate, and authentic transcripts of K1MAN transmissions on those days on the grounds that Mr. Baxter was "not required to keep a log of radio transmissions and can therefore not confirm any alleged transmissions on any particular date."  PSMF Ex. 1c (*Def.'s Resp. to Pl.'s Reqs. For Admis.*) at 3-5, 9-11; DSMF at 6; *Def.'s Opp'n* at 17.  However, he did admit that "there can . . . be and sometimes is incidental interference to ongoing communications which may also be on the published transmitting channel by chance, or . . . by design."  *Def.'s Resp. to Pl.'s Reqs. For Admis.* at 3-5, 9-11; *Def.'s Opp'n* at 4, 9; *Def.'s Sur-Resp.* at 5.

At the same time, Mr. Baxter admits that until July 14, 2009, he transmitted according to the schedule and frequency he published on his website, regardless of whether there were other operators on those frequencies at the time each broadcast was scheduled to begin.  *Def.'s Opp'n* at 4.  On July 14, 2009, he says he "began a new practice" of first finding a clear channel on or near his "published frequency." *Id.*  Mr. Baxter says that "incidental interference is a natural and necessary result of published and scheduled information bulletins."  *Def.'s Sur-Resp.* at 2; *Def.'s Opp'n* at 9 (stating that scheduled "on[e] way transmissions such as K1MAN and W1AW obviously have the potential of inadvertently coming on top of another radio

operator who . . . is unaware of the transmitting schedule"). Mr. Baxter also admits that interference existed between his station and other amateur radio operators on numerous occasions, but claims that he was not interfering with the other operators, rather they were interfering with him. *Def.'s Opp'n* at 4, 9; *Def.'s Sur-Resp.* at 5. He asserts that his "new transmitting practice" effective July 14, 2009 "virtually eliminated all incidental interference to other amateur short wave stations by your Defendant, K1MAN." *Def.'s Opp'n* at 4-5.

Furthermore, even though Mr. Baxter refused to admit the accuracy of the transcripts, he has never denied that K1MAN transmitted on the dates and times the Government has alleged. Indeed, if—as Mr. Baxter argues—his transmissions were perfectly legal, it follows that he must have been transmitting. Mr. Baxter's argument is two-fold: 1) that he was entitled to do so because he was transmitting in accordance with a "published and scheduled information bulletin" and therefore that any interference pursuant to such a bulletin "cannot be illegal interference;" and 2) that in any event, he did not do so either willfully or maliciously. DARPSMF at 2 (# 5).

Mr. Baxter is simply incorrect regarding whether his transmission according to a "published and scheduled information bulletin" violated the law. *Id.* FCC regulations expressly state that "[n]o amateur operator shall willfully or maliciously interfere with or cause interference to any radio communications or signal." 47 C.F.R. § 97.101(d). Contrary to Mr. Baxter's contentions, FCC regulations do not carve out an exception for amateur operators who publish their intent to transmit

in advance.  FCC regulations allow club stations to transmit in accordance with a published schedule and to disseminate information bulletins.   47 C.F.R. §§ 97.111(b)(6), 97.113(b).   But Mr. Baxter's transmissions were not club station transmissions.  Instead, FCC regulations plainly provide that an amateur operator, such as Mr. Baxter, may not "willfully or maliciously interfere with or cause interference to any radio communication or signal," 47 C.F.R. § 97.101(d), and Mr. Baxter's construction of these provisions is "patently inconsistent with the plain language" of the rules and regulations governing amateur radio licensees, *In re Application of Star Wireless, LLC*, 19 F.C.C. Rcd. at 18632.

The Court turns to Mr. Baxter's second point—that even if he interfered, he did not do so "willfully or maliciously."  DASMF at 11.  However, the record reflects that prior to the observed interfering transmissions in late 2004 and early 2005, Mr. Baxter received at least four notifications from the FCC, alerting him that his method of broadcasting was causing interference with other radio signals and generating numerous complaints.  *See January 2002 FCC Letter; April 2004 FCC Letter; First Warning Notice; Second Warning Notice*.  Furthermore, Mr. Baxter admits he continued to operate in the same manner until July of 2009, when he began "first finding a clear frequency on or near the published frequency before starting to transmit."[4]  *Def.'s Opp'n* at 4.

---

[4] Mr. Baxter claims that he changed to this method of transmitting in 2009 "although not legally required to do so."  *Def.'s Opp'n* at 4.  On the contrary, transmitting without first finding a clear channel has the potential to create interference with other amateur radio operators, and such interference could violate the prohibition against willfully interfering or causing interference to any other radio communication or signal.  47 C.F.R. § 97.101(d).  Under the Act and relevant regulations, an amateur radio licensee is obligated to avoid interference with other radio signals, and "[e]ach

To fit within the legal definition of "willfully," the law only requires that the operator engage in "the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission . . . ." 47 U.S.C. § 312(f)(1). Mr. Baxter insists that he did not set about to break the law. It makes no difference. What he did set about to do, deliberately, was to transmit at the dates and times the Government has alleged. This is enough. *Mass. Universalist Convention v. Hildreth & Rogers Co.*, 183 F.2d 497, 500 (1st Cir. 1950) ("Certainly the Act does not expressly confer on anyone any right to broadcast any material at any time . . . .").

The undisputed facts before this Court plainly establish that Mr. Baxter's pre-2009 practice of transmitting according to his published schedule without first locating a clear channel is "patently inconsistent with the plain language" of 47 C.F.R. § 97.101(b) requiring cooperation among amateur radio licensees and 47 C.F.R. § 97.101(d) prohibiting willful or malicious interference with any other radio communications or signals. *In re Application of Star Wireless, LLC*, 19 F.C.C. Rcd. at 18632. As a matter of law, any conscious and deliberate interference with other ongoing communications caused by those transmissions constitutes a willful

---

station licensee and each control operator must cooperate in selecting transmitting channels and in making the most effective use of the amateur service frequencies. No frequency will be assigned for the exclusive use of any station." 47 C.F.R. § 97.101(b). Mr. Baxter was alerted to these regulations by the FCC multiple times before the imposition of forfeiture penalties. *See January 2002 FCC Letter; April 2004 FCC Letter; First Warning Notice; Second Warning Notice.*

violation for which he is subject to forfeiture penalties. *Id.*; *see also* 47 U.S.C. §

312(f); 47 U.S.C. §503(b); 47 C.F.R. § 1.80(a); 47 C.F.R. § 97.101(d).

### c.     The Forfeiture Amount

In its Forfeiture Order, the FCC assessed a forfeiture of $7,000 for these

violations in accordance with 47 C.F.R. § 1.80, Section I, which fixes the base

penalty for interference at $7,000.  For the reasons the Court addressed earlier, it

concludes that the amount of the forfeiture penalty is proper.

### 3.    Violation of 47 C.F.R. § 97.113(a)(3) – Communications in Which Amateur Licensee Has Pecuniary Interest

### a.     The Legal Background

The Federal Regulations also state that no amateur station may transmit

"[c]ommunications in which the station licensee or control operator has a pecuniary

interest."  47 C.F.R. § 97.113(a)(3).  While the regulations do not provide a base

forfeiture amount for violations of the rules prohibiting amateur radio licensees

from making communications regarding matters in which the operator has a

pecuniary interest, the FCC considers these violations similar to violations

concerning the broadcasting of lotteries and contests, which carry a base forfeiture

amount of $4,000 for each violation.  *See Gov't Mot.* at 9; 47 C.F.R. § 1.80;

*Forfeiture Policy Statement*, 12 F.C.C. Rcd. at 17113.

In its statement of material facts, the Government refers to K1MAN

transmissions on November 25, 2004 and March 30, 2005 in which it says that Mr.

Baxter transmitted "information regarding his website, which offers various

products for sale." *Gov't's Reply* at 4 (quoting *Forfeiture Order* ¶ 14). The Government asserts that in urging listeners to visit his website, Mr. Baxter was leading them to a website that contained "offers for credit cards, newsletter subscriptions, and other material of a commercial nature." *Id.* The Government claims that Mr. Baxter conceded that he transmitted his website's address but that he asserts there is a factual dispute over whether the transmissions were pecuniary because he was only looking for volunteers in connection with an award nomination and in connection with checking the publishing of K1MAN's transmitting schedule. *Id.* at 4-5.

In his opposition, Mr. Baxter "stipulates that he frequently references his web site for non pecuniary reasons, and that this is a common practice. . . ." *Def.'s Opp'n.* at 10; DASMF at 7-9, 11. Mr. Baxter says that "in fact, Defendant's web site is referenced in connection with looking for volunteers" and "in connection with checking the K1MAN transmitting schedule." DASMF at 8-9. Finally, Mr. Baxter points out that the Government has not provided any evidence that he has "derived as much as one thin dime of income" from the transmitted references to his website, DASMF at 2, and states that he received "no income whatsoever regarding the credit card" advertised on his website. DARPSMF at 6; DRPRDSMF at 7.

The legal issue here is not what Mr. Baxter thinks it is. Mr. Baxter believes that if the Government cannot prove he actually made money from his transmissions, he is not liable, *Def.'s Opp'n* at 10 ("K1MAN has zero income and has no employees"), but the FCC regulation prohibits amateur radio licensees from

transmitting "[c]ommunications in which the station licensee or control operator has a pecuniary interest," 47 C.F.R. § 97.113(a)(3).  Thus, the regulation prohibits the existence of a pecuniary *interest*, not actual derived revenue.

### b.        The Record Evidence

With this backdrop in mind, the Court turns to the record evidence.  The Government's factual bases for its contention that Mr. Baxter referred listeners to a website in which he held a pecuniary interest are found in paragraphs 13 and 17 of its statement of material facts.[5]  PSMF ¶¶ 13, 17.  The Court previously explained its uneasiness about the accuracy of the transcripts that the Government cited in support of its paragraphs 13 and 17.[6]  The question is whether, in view of the issues, verbatim accuracy is essential to resolving the motion.

In his response to the Government's paragraphs 13 and 17, using his Master Response Key, Mr. Baxter referred to numbers 4 and 24 for paragraph 13 and 4 and 36 for paragraph 17.  DARPSMF at 2 (# 4), 4 (# 24), 6 (# 36); PSMF *with notations*. Number 4 states:

> Mere reference to a licensee's web site in a non commercial and non pecuniary context does not violate FCC Rule 97.113 (a)(3) which bans transmissions over amateur radio with a pecuniary interest for the licensee.  This is a genuine issue of material fact as to whether the licensee had any pecuniary intent or received as much as one dime if (sic) income on a case by case basis with regard to the web site reference and should be decided by a jury.

---

[5] In his response, Mr. Baxter denied the accuracy of the transcript of the alleged December 1, 2004 transmission on the ground that the FCC did not record the transmission.  *Def.'s Opp'n* at 11, 21.  The Government reviewed its records and, in its response, conceded the point and decided not to pursue forfeiture penalties for the December 1, 2004 transmission.  *Gov't's Reply* at 5-6.

[6] The Government also cited its requests for admission.  PSMF ¶¶ 13, 17 (citing Ex. 1b (*Pl.'s Reqs. For Admis.*).  However, Mr. Baxter filed a response to those requests for admission and denied them. PSMF Ex. 1c, (*Def.'s Resp. to Pl.'s Reqs. For Admis.*).

DARPSMF at 2 (# 4).  Number 24 states:

> Ms. Mallay and Mr. Larrabbee (sic) are lieing (sic).  Defendant has never made on air references to subscriptions to his newsletter and both Mallay and Larrabee have thus perpetrated a fraud on this Court.

DARPSMF at 4 (# 24).  Number 36 states:

> Defendant objects to the characterization "advertising" which implies a commercial context when the web site reference was made in a non commercial and therefore non pecuniary context.

DARPSMF at 6 (# 36).

The Court takes from Mr. Baxter's position that he does not deny having referred listeners to his website but does deny referring people to a subscription service.  The transcripts reflect that Mr. Baxter repeatedly referred listeners to two organizations: the International Amateur Radio Network (IARN) and the American Amateur Radio Association (AARA).  He tells listeners that for more details, they can go to www.K1MAN.com or they can send a self-addressed stamped envelope to a P.O. Box in Belgrade Lakes, Maine.

### c.  Pecuniary Interest

Even if Mr. Baxter was referring listeners to his website, it does not necessarily follow that he had a "pecuniary interest" in the website.  The Government's contentions about Mr. Baxter's pecuniary interests rest on two propositions.  First, the Government contends that Mr. Baxter referred listeners to a subscription service at his website.  Mr. Baxter denies he did so.  The Court carefully reviewed the transcripts of the November 25, 2004 and March 30, 2005 transmissions and could locate no reference to a subscription service.  Therefore, the

Court has discounted the Government's claims on that point or at least concludes that there is a genuine issue of material fact as to whether Mr. Baxter did so.

Second, the Government says that Mr. Baxter had a pecuniary interest in the website for K1MAN to which he was referring listeners.  To support its position, the Government referred to the contents of the Forfeiture Order and the Notice of Apparent Liability.  *Gov't's Reply* at 4 (citing *Forfeiture Order* ¶¶ 4, 15 and *Notice of Apparent Liability* ¶ 14).  It is true that the FCC's Notice of Apparent Liability says that Mr. Baxter's website "offers various products for sale, including a monthly newsletter published by Glenn Baxter and offered for sale for forty-five dollars per year." *Notice of Apparent Liability* ¶ 14.  Furthermore, the Forfeiture Order repeats the language in the Notice of Apparent Liability and concludes that he had "a direct pecuniary interest in the products offered for sale on the website about which he provided information on his amateur radio station." *Forfeiture Order* ¶¶ 4, 15.

But to sustain its case, the Government must produce evidence to this Court, not the findings the FCC made on the evidence before it.  47 U.S.C. § 504(a); *Radar Solutions*, 368 Fed. Appx. at 486 ("[t]he [Act] expressly authorizes the district court to hear factual disputes in de novo forfeiture collection actions").  The Act's reference to a "trial de novo," 47 U.S.C. § 504(a), must mean that the Government must do more than put the FCC's Forfeiture Order before the Court and demand that the Court accept the agency's factual findings; the Government must put forward the evidence itself.  The FCC's findings suggest there is evidence from which the Court could make a factual finding that the website for K1MAN was

selling products but, here, there is simply no evidence on this record from which the Court could make an independent determination that this was so.  There is no screenshot of the website, no printout of its contents, no affidavit from someone with knowledge of its contents, no statement by a member of either the IARN or the AARA that he or she was led to the website and made a purchase.

In the absence of such evidence, there remains a genuine issue of material fact as to whether Mr. Baxter had a pecuniary interest in transmitting communications that directed listeners to www.K1MAN.com.  Therefore, the Court denies the Government's motion for summary judgment as to Count III.

## IV.   CONCLUSION

The Court hereby GRANTS IN PART the Government's Motion for Summary Judgment (Docket # 23) as to Count I (willful or repeated failure to respond to FCC requests for information) and imposes the requested forfeiture amount of $3,000 and as to Count II (willful or malicious interference) and imposes the requested forfeiture amount of $7,000.  The Court DENIES IN PART the Government's motion as to Count III (communications in which an amateur station licensee or control operator has a pecuniary interest).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 10th day of January, 2012

38